I'm Cheryl Mundy on behalf of the appellants. May I please the court? The issue in this case is whether Goody had a duty to purchase and maintain property insurance to cover damage to the Ephus and Terracotta facade at the Ritz-Carlton during the renovation projects. We believe the district court ignored all the evidence in the record regarding the court's conduct, which establishes that Goody had the duty to purchase and maintain the insurance. When this case was first before the Fifth Circuit, one of the major issues was whether the contracts or whether the parties intended for the general conditions to apply to any projects that were anything other than a renovation or an addition, because under the district court's interpretation of the contract, the only way that section 11.4, which deals with property insurance, could apply is if the parties anticipated that the contracts would involve work that was other than an addition or renovation. And the evidence establishes that the contracts only anticipated renovation work. First of all, W.H. Holdings only owned one building in New Orleans, which is the Ritz-Carlton. W.H. Holdings is a single-asset company that was created for the purpose of the Ritz-Carlton. Goody did not perform any work for W.H. Holdings other than at the Ritz-Carlton, and W.H. contracted with Goody to perform renovation work. The Applees admitted this in their statements on the motions below. And at the time that Goody was hired to first work on the project, they were first hired by W.H. Holdings in the capacity as an expert witness. The renovation project was already undergoing. W.H. Holdings had a suit against its first general contractor, who I believe left town. So when Goody got involved, Goody knew that it would be a renovation project. The project was ongoing. After Goody got involved, all the evidence establishes, course of conduct evidence establishes, that Goody had the duty to procure the builder's risk insurance. Mr. Collada, who was the project architect under the contract, there was a project architect who was responsible for administering and reviewing the contract. He testified that the owner's attorney, who also happened to represent Goody before and after the project, so had a relationship with Goody, he made the decision to be sure that Goody understood all the coverages required in the contract. He also testified that the requirements were discussed at monthly meetings. Mr. Collada physically shared an office with the owner, the president of Goody, at the time of the contract and was able to discuss issues with him in his office. The parties ultimately, Goody and W.H. Holdings, entered into a guaranteed maximum price contract under which they agreed that Goody could charge the cost of the work plus the fee. It was defined in the contract documents as to what they could actually charge under the contract. Therefore, before they entered into each contract, and this project was broken down, I believe, into 18 different contracts because the way the owners wanted the project to proceed was in smaller portions so that the hotel could operate. So the general conditions applied to all the contracts, and then there were 18 separate renovation projects. Before each contract was signed for the renovation projects, Goody had to prepare a budget for the project. In each and every budget, they included a cost for builder's risk insurance. Mr. Barbier, the project manager, testified that he prepared the estimate after the general conditions but before entering into each contract. So the estimate wasn't prepared at the beginning of the entire project. The estimates were prepared as the project went along and as they knew what they needed, and he continued to include builder's risk insurance in each estimate. Mr. Barbier also testified that Mr. Collada, the project architect, reviewed each and every of the estimate that he prepared to ensure that it confirmed that it complied with the contract conditions, and Mr. Collada reviewed the estimates, saw the builder's risk insurance. He testified that Goody was required to procure the builder's risk insurance, so he confirmed that the estimates did comply with the documents. Then after the parties entered into the contracts, Goody procured the subject policy from ACE. It was a policy where they had to report each project. Goody procured the policy, reported each project as required under the reporting endorsement in the policy, and under the general conditions, Goody was required to provide WH Holdings with a certificate of insurance. Goody provided WH Holdings with a certificate of insurance showing the property insurance policy, and it also stated on there that WH Holdings was an additional insured as required under Section 11.4 of the general conditions. Goody continued to report the projects each month to ACE. They had to report the completion values, so each month they reported the value to ACE, and ACE calculated the premium and charged Goody a premium based on the value of the project. Mr. Ken Goody testified that he paid the premiums each month with the expectation that ACE would cover, under the builder's risk policy, what was required by the contract. Goody also charged WH Holdings for the premiums that it's paid, and WH Holdings paid the premiums for the ACE builder's risk policy with the expectation that the damage would be covered. Is your burden of proof a preponderance of the evidence or something higher? Preponderance of the evidence. Okay, and what case tells us that? I believe it. Okay. I do not have the citation. Because, I mean, the statute, the civil code provision says, in case of doubt that cannot otherwise be resolved. I mean, that sounds a little different from just more likely than not or something like that, a doubt that cannot be resolved. You know, I don't know. Well, the issue was who had the duty, whether Section 11.4 or Section 11.1 governed. Well, we've already found, another panel has already found that there's ambiguity in all of this. So we're past that. We are now at the point of saying, have you shown, I guess, beyond a doubt, because the tie goes to the obligee here, which is ACE. And so, I'm sorry, obligor. So that's ACE. So the question is, have you pushed yourself past that tie, and how much further past that tie do you have to push yourself, when the standard is, in case of doubt that cannot be otherwise resolved? So I'm asking you for some help on that, case law or a different civil code provision that helps us understand that. Well, we believe we have pushed that. There's no evidence that Goody procured the policy for any reason other than to comply with the contract conditions. Well, there is. I mean, not that I, I mean, I think it may have been worked up for this, but the evidence is that they frequently do this to protect themselves. There is some testimony to that effect. The only evidence is the story that Goody created after the fact. Yeah, that's what I wonder. To say that they sometimes purchase insurance to protect themselves. Now, there's a couple problems with that. There's no evidence from the time of the contract formation, either pre-contract formation or during the performance of the contract, that that is why Goody, that Goody chose to purchase the insurance solely to protect itself. No one at Goody can even say who made the decision to purchase the insurance. In the district court opinion studies, Kathy Goody surmised that maybe she purchased it after looking at the contract documents. But there's no evidence that Goody actually only purchased the insurance to protect itself. Well, counsel, you brought up, you mentioned something happening after the fact. Wasn't it two years after the fact that you determined you might have a claim under an ace policy? I don't believe it was. It was not determined two years after the fact. You didn't pursue it for two years? No. I think the issue there is, as you know, it was somewhat of a crazy time after Katrina, and the whole focus for WH Holdings was getting the hotel up and running. And WH Holdings was working with the excess property insurers, and the excess property insurers retained Don Corrigan as its independent adjuster. And Mr. Corrigan testified that he brought up the issue immediately regarding the builder's risk policy, and he discussed this issue with Goody at the first meeting that he held at the Ritz-Carlton and informed Goody that it would have to make a claim under the builder's risk policy. Now, the focus going forward with the idea is if you guys knew all along that that was the point of it, you wouldn't have needed some insurance expert to come rooting around looking for policies that might cover damage. I mean, that's what insurance experts do. You have no problem with that. But that's a little different when we're talking about after the fact. It's a little different from y'all knowing, oh, wait a minute, we're so fortunate because we already have this builder's risk policy, isn't that lovely? Here you kind of needed an expert to tell you, hey, guess what, you might have this possible claim against these people. Well, and that's a little, I mean, I don't know if he's an insurance expert. He was the one that was actually inspecting the building, determining the damage and determining how much it would cost to make the repairs. That was his job to determine the cost to make the repairs. He recognized right away that there was an issue and that certain damages, the excess property insurer's policies covered the damage to the building that was not under renovation. At the time, the entire building was not being renovated. Certain portions were completed, and once projects are completed, those are no longer covered under a builder's risk policy. And also, any portion of the building that wasn't being renovated is not covered under the builder's risk. So he was there trying to address the claims under both policies. Yeah, but he is a guy after the fact. He is not a guy who says, I was there when this contract was negotiated, and I said you all need to go out and buy that coverage for us. And that's my point. My point is he's coming in, and this is what you do. You come in after the fact and you say let's look at all available policies and make a claim on all of them if we legitimately at all can. And so I don't have a problem with that, but that doesn't tend to prove whose burden it was to get coverage and whether Goody assumed that duty or not. That's all I'm saying. It may not be a helpful point. I don't believe that alone. I think you have to look at all the evidence. You have to look at the evidence before the contract formation. The parties made numerous revisions to Section 11.4 to make it clear that the contractor was required to purchase the builder's risk insurance. Now, the courts found those provisions ambiguous, but the parties wouldn't have gone through the effort to make revisions to a contract, insert additional language, insert provisions, if there was no intention that that section would ever apply. Let me ask you this. Why didn't Gardner, since you all are relying on the idea that Gardner made sure Goody understood, blah, blah, blah, why didn't Gardner testify? Why do we need Collada to tell us that? Am I misunderstanding? He was never deposed in the case. Okay. I mean, now the issue with Mr. But he's your attorney. You can't get an affidavit from him or something like that? I mean, the issue with maybe we could have obtained an affidavit from him. He represented Goody with respect to this contract. He also represents or he represented WH Holdings with respect to this contract but represented Goody before and after. He's also Goody's attorney for other matters. So he's involved. Okay, but he's a potential witness. I mean, I guess I'm just trying to understand because we've got all this gyration about what Collada knew and is that evidence and all that, and it seems like Gardner is still alive and everything, right? You can find him. I mean, he's not disappeared. I just am not understanding why we're putting all this energy into whether Collada knew and overheard and all this what this other guy said if this other guy is available. I'm just not getting it. Well, under the contract, Mr. Collada was responsible for administering the contract. Under Article IV, the contract is administered by the project architect. So we're relying on his testimony and his understanding of the contract and the requirements in the contract that Goody purchased builder's risk insurance and also looking at the conduct between the parties at the time of formation and throughout the performance of the contracts. Okay. You've saved time for rebuttal. Appreciate it. Ms. Engelhardt? Good afternoon. Leah Engelhardt on behalf of Ace American Insurance Company. May it please the Court. First of all, I think one of the first things I want to do is to clarify something that was said. The first thing counsel said was this case is about the duty to purchase and maintain builder's risk insurance, and that is not a correct statement under the terms of the Ace American Builder's Risk Policy, which is the driving document here pursuant to which appellants can establish that W.H. Holdings was a named additional insured. That's the document that governs. And the broad form named insured endorsement, which is the only vehicle by which W.H. Holdings can establish named additional insured status, specifically states that the policy will recognize as a named additional insured a party in interest that the insured, reference Gootee Construction, the named insured, is responsible to insure. That is a difference from a responsibility to procure and maintain. It is a step further. So not only must Gootee Construction. So I may have an obligation to go get insurance to cover myself, then I might also have an obligation to go get insurance to cover you, and you're saying those are two different things. Because insurance has to cover somebody, so procuring insurance has to mean something. That's the first step. Judge Hayes, that's exactly right. That's the first step. So the endorsement requires, and you're not going to go insure someone if you're not going to procure it first. So the endorsement requires that the named insured Gootee Construction, that is the only named insured under the policy, must be responsible to insure a party in interest. And that is not just must maintain an insurance policy, but Gootee must not only have an insurance policy, but must name the party in interest as an additional insured and must be responsible to do that. In this particular case, that means that Gootee Construction is contractually obligated to insure a party in interest. I'll tell you, you get to the end of the day here. The insurance was purchased. Gootee purchased it. And you gave certificates of insurance, all bought and paid for. Everything's fine. And Ace says, nope, we're out. We don't pay. So all this insurance that's been paid for, it doesn't have to be paid. Now, I know that's simplistic, and most of my colleagues would say that I'm never simplistic. I'm overly complex. But that's where we are. We got to the end of the day, and her client doesn't have any insurance on this thing. Well, in response to your statement, Judge King, a couple of things. First of all, the policy that was issued by Ace American Insurance Company to Gootee Construction is a blanket policy. It was not purchased specifically for this project. I understand that, but didn't you purchase, I mean, provide certificates of insurance? Gootee Construction did not, and Ace American Insurance Company did not. Gootee Construction's broker did provide a certificate of insurance to WH Holdings as the owner of the project. And that, as the district court recognized, that certificate of insurance, two things. First of all, it has a very general reference to it with respect to naming WH Holdings and some of its related entities as an additional insurer. But there is no reference in that certificate of insurance linking that particular manuscripted wording to the builder's risk policy. There are a number of policies listed on that certificate of insurance. So it's not specific, and as the district court stated, it suffers from the same ambiguities that the construction contracts suffered from. Secondly, that was issued by Willis. There was no testimony from Willis, the broker, for Gootee Construction as to what that certificate said meant, who prepared it, and what it actually meant and what that reference was for. And thirdly, I'll add that under Louisiana law, a certificate of insurance is not evidence of coverage where the coverage doesn't otherwise exist. I'm sure it's not, but, you know, that would be too simple. And just to further answer, there were a number of coverages, a number of policies that Gootee was required to put. I mean, it's not uncommon for me to say if somebody's going to come work on my yard, I want to make sure they have worker's comp, for example. So if one of their guys falls out of my tree, I'm not having to worry about it. That's different from them covering me for somebody else getting hurt because the guy fell out of the tree. Those are two separate policies. I might demand one or the other or both, and that's what you're saying, that that's why this whole certificate of insurance can get a little convoluted because I might want to know that you're insured without you necessarily insuring me. That's true, and that happens in construction projects. Very common. Very, very common. And there are certificates that are issued by it, and that sort of gets us off track here. But the evidence here, the course of conduct evidence, which is plentiful and was certainly set out by all the parties in the briefs, and I won't go through all the detail of that, but the course of conduct evidence with respect to the purchase of the insurance is this. The insurance was purchased by Gootee Construction. It was a blanket policy. It was not specific to this project. It covered a number of projects to the extent that the insurer, Gootee, would report those projects that it did want to be insured under the policy. And, yes, it does not dispute that it reported this particular project to its insurer. And the evidence, which counsel referred to, is that Ace American received the reporting requirements of this insurance. When it was reported to Ace American, it was included, and there was a premium that was adjusted for that. All of the principles of Gootee were deposed in this case. Ken Gootee, who was the president of the company at the time, Pat Gootee, who was handling the contracts and the insurance, and his specialty was risk management, Kathy Gootee, who was the CFO, and David Barbier, who was the senior estimator and the project manager for this case, all of whom testified that the reason that this insurance was purchased is that that is a consistent practice of this company to always purchase builder's risk, whether or not the owner purchased it or not, and whether or not the contract documents required it or not. Specifically, on this particular project, there were swing stages and scaffolding at the Ritz-Carlton that were estimated to be a value of a million dollars. This is not something that would normally be covered under an owner's policy. And so the insurer typically purchased insurance to cover its equipment and material that would not otherwise be covered. There is no evidence in the record to contradict that testimony. What evidence is there about why this addendum was put onto the thing, 11.1.5G? What evidence? How did that thing happen? Well, certainly Ace American was not involved in the negotiation of that contract, and Gootee and W.H. Holdings negotiated and manuscripted that particular contract. And Gootee is not a party to this case and has never been a party to the case. And the short answer is there is not clear evidence. There is not clear evidence as to why that particular provision was inserted into this contract, which is a standard AIA general conditions contract, which, as you can see in the record, was manuscripted in many sections by these two parties. And the evidence is that Tom Gardner, who was counsel for W.H. Holdings, the owner at the time of the negotiation of the contracts, he was very involved and mostly involved in creating the contract wording, although Pat Gootee, who was a principal at Gootee, did testify that he did make some suggestions on wording. So as to who specifically drafted that, who put it in the section that it is currently sitting in, section 11.1, there is no clear testimony in that. And with respect to section 11.4.1 and section 11.1.5G, which are the two provisions that it seems that no one can reconcile, which leads us to a situation where the contract appears still to be ambiguous, there is no evidence. Do you win if we still think it or we're still confused at the end of the day you win because you're the obligor, right? Yes. The civil code. Yes, because it is not ace Americans burden of proof to prove coverage under this policy. What is that degree of burden of proof? Is it preponderance of the evidence or is it something more? I'm just not sure what this if any doubt remains means. Is that a reasonable doubt of clear and convincing, preponderance of the evidence, something else? Well, I don't have a case site in front of me and would certainly be more than willing to provide the court with one if you would allow this afternoon by letter. However, the Louisiana Civil Code, as we know in the civilian tradition in Louisiana, the Louisiana Civil Code controls, not case law. And the Louisiana Civil Code is clear. When there is doubt and the ambiguity cannot be resolved, the ambiguity is construed against the obligee and not in favor of the obligee. No, I get that. But I guess what I'm saying is how do we weigh, how much doubt do we have to have? You know, we have traditional burdens of proof, which exist in Louisiana as well. And I'm saying, as I understand it, in general, like in a car wreck case, who had the red light? The plaintiff just has to prove more likely than not that they didn't have the red light or the defendant had the red light or whatever. And I'm wondering here, what is this quantum of doubt that we have to have for you to win? Or what amount of doubt do they have to overcome for them to win? I'm just trying to put that in a traditional preponderance of the evidence analysis, and I'm having trouble with it. I hope I can try to answer that. But I think the clear answer to that is that they have to resolve the doubt. There cannot be an ambiguity. Because with the ambiguity, there is no clear understanding of what the construction contracts required. Without a clear directive and understanding of what the contracts required in terms of who was to procure the insurance and whether or not the party procuring the insurance was responsible to insure the other party. Okay, so what if gardeners had testified and said, yes, I told Mr. Gutti you've got to go out and get this and insure WH Holding. Would that be the kind of evidence that would then overcome this doubt? I'm looking for what would we be looking for. They've proffered some stuff, some random bits of information, and I'm saying what it takes that from being not enough to being enough to overcome the doubt. I don't think that's enough. Okay. Here's why. Oh, the gardener thing, the hypothetical gardener wouldn't be enough. Because that's just additional testimony about he said, she said. Because what has to be resolved is the conflict between Section 11.1.5G and 11.4.1, both of which refer to builder's risk insurance, one of which, 11.1.5G, has a defining factor in it that switches the burden when the construction is a renovation of an existing structure. And that switches the burden of procuring the insurance to the owner. Not only does it switch the burden of procuring the insurance to the owner, it includes an additional requirement that the owner name the contractor as an additional insurer. So, counsel, and you can correct me if I'm wrong, but isn't it that the evidence has to clearly show that the contracting parties intended that Gutti would provide the insurance? Is that what it is? The evidence has to clear. And if it's not clear. Then it's ambiguous. All right. And it has to be clear. Because we have the ambiguity. And the course of conduct evidence was to be used to establish one of two things. One, to clarify the intent of the parties. Or two, to resolve the ambiguity, which is required by Louisiana law. And if you cannot do those two things, the contract remains ambiguous, and therefore the contracting parties to that contract, you cannot then bootstrap into the ace American policy through the broad form named insured endorsement a responsibility to insure. So while the contract remains ambiguous, you don't get to the policy, and you cannot satisfy the requirements of the endorsement in the policy. And the result of that is WH Holdings then cannot meet its burden of proof, and it cannot establish named additional insured status. So, yes, it has to be clear. Just a couple of things to go back to. Once again, the question about that there has to be given meaning to all the sections. 11.1.5G was completely manuscripted and put into the contract. If you only give effect to 11.4.1, you're not giving effect to 11.1.5G. While there is testimony in the record that the five contracts that are at issue for the damage in this case were contracts for renovation, and that's not in dispute, what is not in the record, and there is no evidence, is whether or not these two parties did or did not contemplate any other work. And the absence of that evidence, and the only evidence that the five contracts involved were for renovation, is not determinative of the fact that the parties did not contemplate something else. There is no evidence that they did or did not, one way or the other. And back to the reporting of the project, so I'll add another thing that David Barbier, the senior project manager, he did testify very clearly that in 99 times out of 100, that this company would purchase builder's risk insurance to protect its interest on various projects. And the only time it did not typically do that is when the owner, they were clear that the owner had purchased insurance to include Gootee's interest as well as the owner's interest. On that, the premium, was there any evidence about whether the premium encompassed, was charged in an amount that would encompass this extra risk of the additional insured, or was it the standard premium that's charged to cover the scalp holding and all that? It was the standard premium that was charged for the policy. There was a rate that was included in an endorsement, and you had to report the value of the particular project at that particular time during that month. That rate was then applied, which is a stated rate in the policy. An amount was calculated, and a bill was sent, and Gootee paid. And would it have been more if they'd said, and we need to be sure that WH Holdings is an additional insured, or would that have been part of the same rate? That probably would have been part of underwriting, and the underwriting, that is a question that is not known at this time. There was no evidence on it. There's no evidence on that. Thank you. Back to the experts. I just want to be sure you've answered Judge King's point. Essentially, like, did they pay a premium for nothing? And you're saying, no, they didn't pay a premium for nothing because they got the builder's risk for the scalp holding and all that stuff. If that stuff had been damaged, they had a claim, they being Gootee, had a claim for that. Yeah, Gootee had a claim for that. In fact, that is in our brief. The policy specifically defines as covered property, temporary structures on the site, comma, including scaffolding. So that is part of the claim. So they got something for their premium is your argument. Absolutely. And Gootee would have had coverage for the project. The question here is whether or not WH Holdings is a named insured under the policy and can make a claim. So Gootee had messed up in some way that damaged WH Holdings and gotten sued, then ACE would have to defend. I mean, that would be the liability side, though. Well, it could be the liability side or there could be damage, too. You know, if under the contract, WH Holdings came to Gootee and said, wait a minute, Hurricane Katrina happened and there's damage to work that you had ongoing at the time, we want you to pay for it, Gootee could then turn to its insurer and say, I have a claim, I need to make a claim on the policy. Gootee did not make a formal claim under this policy. They're making a first-party claim. Yes. That's what this whole case is about. Yes. A first-party claim, we're not interested in whether Gootee would add coverage for some sort of third-party, you know, general liability type situation. That is correct. That is correct. With respect to the expectations of Gootee, of WH Holdings, and that they expected coverage under the policy, as the district court correctly noted, there is no evidence in the record that WH Holdings had any reasonable expectations of coverage. The premiums that were included on the cost and the budgets and the cost and submitted on the pay applications by Gootee to WH Holdings were permitted by the construction contracts. These are guaranteed maximum price contracts, and they were permitted by the contracts as a recoverable cost. And it is in their best interest to bill back and receive recoverable costs, and so they did it in accordance with the contract, and that is why the architect approved it, because it was an approved recoverable cost. I did want to make one final point, which was my second point today. I'm not getting a yellow light, but I just want you to know you're on. I'm watching the time. Thank you. I did want to make this point with respect to the provisions that have not been reconciled by the course of conduct evidence, and the district court did find are still ambiguous. Even if this court were to accept appellant's arguments with respect to the textual arguments of 11.1.5G and 11.4.1, you still cannot get insured status through 11.4.1, and the reason is that particular provision, while it speaks to builder's risk, it does not include a corresponding requirement that the contractor name the owner as additional insured. There is that corresponding requirement in 11.1.5G, but it's not 11.4.1. What is in 11.4.1 is a statement that the insurance shall include the interest of the owner, subcontractor, and subcontractors. It does not state name them as an additional insured, and if you look at one provision below that, which is in the same section, 11.4, dealing with property insurance, if you turn to 11.4.2, which is the provision just below that, also in the same section, it specifically states the same language, shall include the interest of the owner, subcontractors, and sub-subcontractors, but it also includes an additional requirement. It says, and name the owner and subcontractors as additional insured, and that is the standard form of the language of the AIA 201-1997 general conditions. That was not manuscripted by the parties. It is in the standard form, and it's there because it means something. Okay. Thank you. We have your argument. Thank you. Ms. Mundy. In response to the argument that there's a difference between whether the contract or to name them as additional insured, there's really no difference. You cannot include the interest of the owner as required under the contract unless they're named as an additional insured. Those are the only interests that could be included. With respect to ACE's position that Goody purchased the insurance to protect their scaffolding and not in relation to requirements under the contract, if that were the case, if you look at appendix exhibit number eight, which is the reporting form, the reporting form would look much different. For each project at the Ritz-Carlton, ACE reported the completed values for the project. They didn't report the project based on the value of the scaffolding. The value would have been the same for every project. If that were the case, you would just report the value of the scaffolding. Don't you have a liability component here? This policy, the builder's risk policy that was issued by ACE, is simply a property insurance policy. It doesn't have a liability component. Our position is that the liability component would be covered by 11.1.5G of the policy, of the general conditions of the contract. Section 11.1 deals with the requirements for liability insurance. Article 11.1 is contractor's liability insurance, and then in 11.1.1 it sets forth the types of claims that the contractor is required to insure. When you look at 11.1.5.G, which ACE is relying on, this section says this insurance covered by paragraph 11.1.1 shall be written for not less than the following limits or greater if required by law. When you go back and look at 11.1.1, it does not cover the types of claims that issue. 11.1.5 deals only with liability insurance. As we state in our brief, builder's risk policies can either have a liability portion or a property portion. This claim only relates to property insurance, and the ACE policy that was issued and required with respect to the requirements of the contract, that is a property insurance policy. For that, you look at section 11.4. The only way to make sense out of both 11.1.5 and 11.4 is to hold that 11.4 applies to property insurance, which is at issue in this case, and 11.1.5 applies to liability insurance, which is not at issue in this case. But isn't that part of the reason it's confusing is that you've got the builder's risk policy listed in a section of the agreement that talks about liability insurance? Because it could be the liability portion of the builder's risk policy. There could be a liability portion. The ACE builder's risk policy that's at issue doesn't have that liability portion. And then you've got a certificate of liability insurance, which lists the builder's risk policy. Is that right? Am I reading that right? The form does state liability insurance at the top, but when you look at it, All I'm pointing out is that can be confusing. At the top of it is called a certificate of liability insurance, and your point to me is it isn't liability insurance, yet when I look down at D, I see builder's risk. No, and I don't believe that the certificate of insurance is insurance. What we believe is that it adds to the course of conduct that establishes that Goody was required to procure the insurance. Goody obtained the certificate of insurance from its broker, Willis, and Mr. Barbier Well, I'm talking about a certificate of liability insurance. Are we talking about the same certificate? That's the certificate of insurance. Goody obtained it. No, I want to make sure you understand my question. When I say certificate of liability insurance and you say certificate of insurance, are we talking about the same thing? Yes, we are. All I'm pointing out is it's called a certificate of liability insurance. And I believe the broker used the wrong form, but on that form it identifies the property insurance policy. It does not only identify liability policies, and that's my point with respect to the certificate of insurance that's in the appendix. Which confuses me. I guess all I'm pointing out is that could lead to some ambiguity. Don't you agree? I don't believe it could lead to ambiguity because if you look at the policies that are referred to in that certificate of insurance that lists the number for the ACE builder's risk policy that's at issue, and that's a property insurance policy. Okay. Well, it's a complex case. We appreciate y'all's arguments, and we will stand adjourned for this afternoon and reconvene this panel tomorrow afternoon.